## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**MARK RADCLIFFE,**

       **Movant,**

**v.**                        **Case No. 5:17-cv-04045**
                                 **Criminal Case No. 5:16-cr-00019-02**

**UNITED STATES OF AMERICA,**

       **Respondent.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court is Movant Mark Radcliffe's *pro se* Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255. (ECF No. 256). This matter is assigned to the Honorable Irene C. Berger, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the undersigned respectfully **RECOMMENDS** that Movant's motion be denied and this matter be dismissed, with prejudice, and removed from the docket of the Court. Given that the undersigned conclusively **FINDS** that Movant is not entitled to the relief requested, an evidentiary hearing is not warranted. *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970).

## I.    Factual and Procedural Background

In October 2016, after a four-day jury trial, Movant Mark Radcliffe ("Radcliffe") was convicted of conspiracy to tamper with a witness in violation of 18 U.S.C. §§ 1512(b)(1)

and 1512(k). (ECF No. 174);[1] *United States v. Radcliffe*, No. 5:16-CR-00019-02, 2016 WL 6080201, at *1 (S.D.W. Va. Oct. 17, 2016). On May 10, 2017, Radcliffe was sentenced to serve 60 months in prison, less his time served, to be followed by three years of supervised release. Radcliffe is scheduled to be released from prison on July 20, 2021. *See* https://www.bop.gov/inmateloc (last accessed Feb. 27, 2019).

### A.    *Radcliffe's Trial*

The government's theory at Radcliffe's trial was that on December 23, 2015, Radcliffe's son, Seth Radcliffe ("Seth"), kidnapped at gunpoint his on-and-off again 19-year-old girlfriend, Miranda Sexton ("Sexton"), and drove to North Carolina. (ECF No. 248 at 11). The government adduced that almost immediately upon learning about his son's arrest, Radcliffe began communicating with his son's best friend, Jimmie Harper, Jr. ("Harper"), to influence Sexton to minimize Seth's actions to absolve any potential criminal charges against Seth. (*Id.* at 12). According to the United States, Harper, Radcliffe, and Seth, knowing that Sexton was subpoenaed to testify before a grand jury, devised a plan for Seth to write a letter detailing the version of events that Sexton should "stick to" so that Seth would not be indicted. (*Id.* at 16-17). Radcliffe allegedly retrieved the letter from Seth, who was in jail, and provided it to Harper on January 24, 2016, two days before Sexton was scheduled to testify. As the United States argued, Harper then communicated the letter to Sexton. (*Id.* at 15). The evidence which the government used to prove its case that Radcliffe engaged in a conspiracy with Harper to influence Sexton's testimony primarily consisted of call logs showing numerous calls between Radcliffe, Harper, and Sexton; recorded jail calls between Radcliffe and Seth; the letter itself, which

---

[1] The ECF citations in this PF & R correspond to Radcliffe's criminal case: 5:16-cr-00019-02.

Radcliffe admitted that he gave to Harper to pass along to Sexton; and the testimony of Radcliffe's co-conspirator, Harper, who admitted his involvement in the conspiracy and received a plea deal. (*Id.* at 18). As summarized below, Sexton, Harper, and Radcliffe all testified during Radcliffe's trial.

### (1)    Sexton's Testimony

At trial, Sexton first provided a detailed account of the alleged kidnapping. She testified that Seth arrived at her home on December 23, 2015, because she had not been responding to his text messages. (ECF No. 249 at 170). Sexton told Seth that she did not "think things were going to work out" between them. Seth became upset, retrieved a handgun from his car, and told Sexton that he was going to kill her and then commit suicide. (*Id.*). Sexton stated that she eventually went outside onto the porch with Seth and began "screaming and crying for help." (*Id.* at 171). A neighbor appeared in response to the cries and began to walk over to Sexton's house, but retreated when Seth pointed his gun at the neighbor. In the meantime, Sexton went back inside her home and grabbed the phone, but Seth followed her, jerked the phone out of her hand, and hit her in the mouth. (*Id.* at 172). Seth told Sexton it was time to leave, and he went out onto the porch. Sexton was able to lock Seth out of the house and again tried to use the phone to call for help. (*Id.* at 172-73). However, Sexton heard gunshots and saw that Seth was in her living room. (*Id.* at 173). Sexton then told Seth that they should "just go" because she was afraid that he would kill her if she did not go with him. (*Id.* at 174-75). Sexton left the house with Seth, taking her dog, but without putting on any shoes, and they got into Seth's car. (Tr. at 175). Sexton stated that they stopped at Sexton's cousin's house where she ran to the door and dropped off her dog inside of the doorway. They also stopped at Seth's brother's house. Sexton testified that she made no effort to escape during these stops, because Seth

3

was never out of her sight and she was too afraid to try. (*Id.* at 176-77). Seth drove Sexton toward North Carolina during which Sexton was able to call 911. (*Id.* at 178-79). Eventually, police attempted to pull over Seth's car and a car chase ensued. After 15 to 20 minutes, Seth finally pulled over and was arrested. (*Id.* at 185).

Sexton testified that during the car chase, she called Harper at Seth's request "to help [Seth] out." (*Id.*). Sexton spoke with Harper again that night to tell him what had happened. When she spoke to him the next day, Harper told her that she "needed to leave out" certain facts when she was interviewed by a detective later that day. According to Sexton, Harper told her that certain details would be harmful to Seth and would cause him to be "locked up over a stupid decision." (*Id.* at 186-87). Sexton admitted that she was not truthful with the detective and left out the details that Harper instructed her to omit. (*Id.* at 189). Sexton testified that, on January 15, 2016, she was served with a grand jury subpoena and told Harper about it. (*Id.* at 189-90). Sexton indicated that the day before she was scheduled to testify, Harper provided her with a letter that Seth had written containing his version of events. Harper told her to stick to the story in the letter, although, according to Sexton, the letter was not factually accurate. (*Id.* at 190-91). Harper indicated that if Sexton testified consistently with the letter, then there was no way Seth could get convicted of kidnapping. Sexton testified that Harper told her to tell "the truth," which she understood to mean to only share the details that were most favorable to Seth. (*Id.* at 198).

Sexton admitted that she kept her testimony to the grand jury on January 26, 2016 consistent with Seth's letter, because she was afraid that Seth would get into trouble and never forgive her. (*Id.* at 198-99). Sexton again testified before the grand jury on March 22, 2016 and was again untruthful because of her concerns for Seth. (*Id.* at 199-200). In

4

terms of the witness tampering case against Radcliffe, Sexton was clear in her testimony that it was Harper who "immediately" started telling her how much it would hurt Seth if she told the truth about what really happened. (ECF No. 250 at 4). Sexton testified that it was Harper who talked to her about changing her story and that Radcliffe was not mentioned during her conversations with Harper. (*Id.*). Sexton also testified that in her subsequent communications with Radcliffe, he never asked her to lie or alter her story to help Seth. (*Id.* at 17).

### (2)    Harper's Testimony

Harper was the key witness against Radcliffe at trial. Harper first explained that he had entered into a plea agreement in which he pled guilty to aiding and abetting an arson and conspiracy to tamper with a witness. (ECF No. 248 at 48). The arson charge stemmed from a fire that destroyed Harper's home, conveniently facilitating his filing of a million-dollar insurance claim. (ECF Nos. 248 at 48-49, 249 at 31-32). Ironically, Harper was under investigation for the arson during the time that he was tampering with Sexton's testimony. Thus, some of the evidence used at Radcliffe's trial included serendipitous recordings taken by a confidential informant, Gary Matheny ("Matheny"), who was wearing a recording device to obtain evidence for the arson investigation. (ECF Nos. 248 at 17, 249 at 40). Matheny was Harper's partner in a synthetic marijuana business and had helped Harper burn down his house. Matheny agreed to cooperate with authorities in exchange for immunity relating to his own pending criminal charges. (*Id.* at 17-18, 49-50).

Turning to the relevant facts, Harper testified that Sexton called him from Seth's cell phone at 9:19 p.m. on December 23, 2015 and told him that Seth had a gun and that the police were chasing them. (ECF No. 248 at 56, 60). Harper then called his sister, who

was related to Seth's family by marriage, to tell her to advise Seth's parents of the situation. (*Id.* at 57). Harper stated that he did not have Radcliffe's phone number and had not talked to him on the phone or texted with him prior to that night, which is why he asked his sister to get a hold of Radcliffe and his wife. (*Id.* at 57-58). After the initial call from Sexton stating that police were chasing the car, Harper tried to reach Sexton several more times. Sexton finally called Harper again on Seth's phone at 9:24 p.m. (*Id.* at 60). At 11:49 p.m. on December 23, 2015, Harper received a phone call from Radcliffe, which lasted for 28 minutes. Harper called Radcliffe back at 12:16 a.m. on December 24, 2015, and they spoke for another 12 minutes. (*Id.* at 61). According to Harper, he and Radcliffe spoke about the "situation" during those two calls and discussed that they needed "to get to [Sexton] before anyone else did." (*Id.* at 61-62).

Harper testified that there was another series of calls on December 24, 2015. Harper stated that Sexton called him at 9:44 a.m. that morning, this time on her own phone, and they spoke for 12 minutes. (*Id.* at 63, 65). During that conversation, Sexton told Harper that her mother had picked her up from the police station and brought her home. (*Id.* at 63). Sexton reported that she and Seth had an argument on the porch the prior evening after which she locked herself inside her house and Seth shot through the door. (*Id.* at 64). Seth then told her to "please get in the car. I don't want to kill you." (*Id.*). Sexton's neighbor came to help, and Seth pointed the gun at the neighbor, stating, "Die, bitch," and proceeded to pull the trigger. (*Id.*). According to Harper, Sexton stated that the gun did not discharge and Seth said "I don't know why the gun didn't go off" as they got into the car and drove away. (*Id.*).

Harper testified that right after speaking to Sexton on the morning of December 24, 2015, he called Radcliffe and they spoke for five minutes. (*Id.* at 65). As reflected in

call logs, Harper then tried to call Sexton twice, but he did not reach her, so he called Radcliffe back and talked to him for four minutes after which Harper answered a call from Sexton and spoke to her for six minutes at 10:06 a.m. Harper then called Radcliffe again, and they talked for 17 minutes. After finishing that call, Harper called Sexton and had an 18-minute conversation, which he followed with a call to Radcliffe. (*Id.* at 65-66). Harper stated that the purpose of all of the back-and-forth calls that morning was because he was "talking to [Sexton] about everything that had happened and trying to figure out what to do because detectives were coming" to speak to Sexton in 30 minutes. (*Id.* at 67). Harper stated that he and Radcliffe were trying to get Sexton not to say that Seth forcibly took her from her home. Sexton complied and told the police that she went with Seth willingly. (*Id.* at 67-68). Harper stated that he received another call from Sexton at 12:26 p.m. on December 24, 2015. Harper attempted to call Radcliffe, but they did not speak again until that evening when they had two short conversations. (*Id.* at 68-69).

Harper testified regarding numerous additional calls and text messages he had with Radcliffe and Sexton on December 30, 2015 and January 7, 2016. (*Id.* at 83-87, 93). Harper stated that he told Radcliffe that Sexton had received a letter in the mail regarding Seth's preliminary hearing. He and Radcliffe discussed the situation and decided to tell Sexton not to attend the hearing. (*Id.* at 94). Harper texted with Radcliffe on January 21, 2016 about Harper going to meet with Seth at the jail to discuss a letter that Seth was writing containing his version of events. (*Id.* at 100-01). Harper identified a recorded jail call in which he talked to Seth on January 17, 2016. Harper told Seth not to worry, because he and Radcliffe already had a plan in place for Seth to write a letter laying out his version of events to "cover up all the holes" so Seth "wouldn't get into trouble." (*Id.* at 110-13). Harper stated that when he mentioned to Seth that Radcliffe was "real careful about

saying anything," he meant that Radcliffe was using Harper as the go-between, meaning that Radcliffe would call Harper and then Harper would call Sexton. (*Id.* at 111).

Harper testified that he told Radcliffe about Sexton's grand jury subpoena, and they devised the scheme to use a letter from Seth to mold Sexton's testimony. (*Id.* at 117, 119). Harper met with Radcliffe on January 24, 2016 inside of Harper's vehicle in the jail parking lot, and Radcliffe gave Seth's letter to Harper. The letter detailed Seth's account of the events. (*Id.* at 122). Radcliffe and Harper agreed that they needed to make sure Sexton's testimony was consistent with the letter. (*Id.* at 130). According to Harper, the purpose of the letter was "to stop an indictment from happening." (*Id.* at 133). Harper then took the letter to Sexton and went through it with her, which Radcliffe knew was going to happen, in order to prepare Sexton for her grand jury testimony. (*Id.* at 134, 138, 142). During the meeting with Sexton, Harper re-emphasized the length of sentence that Seth faced in an effort to make Sexton feel obliged to go along with the plan. (ECF No. 249 at 4). Harper told Sexton that her testimony was vital to Seth's freedom and reassured her that Seth was a changed man. (*Id.* at 5). Harper also told Sexton that he would email her a copy of the letter so that she could review it again before she testified. (*Id.* at 6). Harper indicated that the main point was for Sexton not to admit that Seth forced her to go with him that night. (*Id.* at 8-9). Harper instructed Sexton to say "I don't know" rather than provide any responses that were damaging to Seth. (*Id.* at 10). Harper continued to communicate with Sexton and Radcliffe, including telling Radcliffe that Sexton was ready for her testimony and intended to stick to the "truth," which meant the contents of the letter. (*Id.* at 19-24). After speaking with Sexton, Harper talked to Radcliffe and told him how the meeting with Sexton went. (ECF No. 249 at 13).

According to Harper, he was a "bit panicked" and knew that he was in trouble when Sexton called him after testifying before the grand jury, because Sexton said that she was asked if she had been speaking to Harper. (*Id.* at 26-27). Harper was subsequently served with a federal subpoena and a target letter. (*Id.* at 27). Harper admitted that he spoke with his sister and initially denied that he had tampered with a witness. (*Id.* at 28). However, he insisted that he was now telling the truth. Harper maintained that Radcliffe was "100 percent behind" tampering with Sexton as a witness and admitted that he assisted Radcliffe in unsuccessfully trying "to cover up a violent crime." (*Id.* at 77). Harper claimed that Radcliffe was at the top of the chain of command, because he was the elder and more experienced individual. Harper testified that he was the one chosen to communicate with Sexton, because she trusted him. (*Id.* at 59-60).

On cross-examination by Radcliffe's attorney, Harper conceded that he had credibility issues. He admitted his previous unlawful conduct, including the arson of his home in which a firefighter was injured, and further admitted that he also previously helped his parents burn down their house in order to file a fraudulent insurance claim. (ECF Nos. 248 at 48-49, 249 at 31-33). Harper freely admitted that he lied about both arsons. (ECF No. 249 at 32, 34). Harper also acknowledged that until his arrest for arson, he made a large portion of his income from selling synthetic marijuana, which was illegal. (ECF Nos. 248 at 50, 249 at 34-35). Harper explained that he was testifying against Radcliffe in the hope of receiving a reduced sentence for his crimes, because he faced nine years in prison. (ECF No. 249 at 36-37).

### (3)    Radcliffe's Testimony

Radcliffe testified on his own behalf at trial. Radcliffe acknowledged that he did not have a relationship with Harper, or even have Harper's cellphone number prior to the

kidnapping. (ECF No. 250 at 82). Radcliffe stated he did not like Harper, because Harper was a bad influence on Seth. However, Radcliffe admitted that he spoke to Harper numerous times after Seth was arrested. Specifically, Radcliffe testified that he spoke to Harper for 28 minutes at 11:00 p.m. on the night of the kidnapping, talked to Harper several times the next day, and continued to communicate with Harper regularly through phone calls and text messages. (*Id.* at 84-85). Radcliffe also affirmed that he was in contact with Sexton after the alleged kidnapping. (*Id.* at 86). He stated that Sexton advised him by text message at 10:28 a.m. on January 7, 2016 that she received a notice regarding a preliminary hearing in Seth's case. (*Id.* at 87-88). Radcliffe asked Sexton if it said that the charges would be dismissed if she did not go to the hearing. (*Id.* at 88). Within approximately the next hour, Radcliffe called Harper and they spoke for a little over six minutes; Harper called Sexton and they spoke for almost 19 minutes; Harper called Radcliffe back and they spoke for just over nine minutes; and then Harper called Sexton again and they spoke for almost eight minutes. (*Id.* at 87-89). Sexton did not attend Seth's preliminary hearing. (*Id.* at 89-90).

Radcliffe also testified at trial that he told Seth in a recorded call on January 13, 2016 that Radcliffe had spoken to Sexton about the events of the alleged kidnapping and Sexton did not want Seth to spend a lot of time in jail simply because he "lost his temper." (*Id.* at 92). Radcliffe also admittedly said to Seth during that call that he would contact Sexton to get her to speak to the neighbor who interrupted the kidnapping and at whom Seth pointed his gun. (*Id.* at 93). On January 15, 2016, Seth told Radcliffe in a recorded call that Seth was going to write a letter to "put together a legal strategy." (*Id.* at 94). Seth advised Radcliffe that the purpose of the letter was to "get everyone on the same page" because if they had the same version of facts, he knew that he would be "okay" in the

10

kidnapping case against him. (*Id.* at 102). Radcliffe's wife expressed concern regarding speaking about the proposed "legal strategy" over the phone because it was being recorded by the jail. (*Id.* at 95, 103). Nevertheless, Radcliffe stated that he was going to meet Harper and give him Seth's letter. (*Id.* at 103-04). Radcliffe further admitted that when he received the letter from Seth, he read it and planned to give it to Sexton because it was "really, really important" to Seth's freedom. (*Id.* at 106). He stated that he believed the letter to be the accurate version of events, which was that Sexton never felt threatened by Seth even though he showed up and shot down her door with a gun. (*Id.* at 106-07). Radcliffe gave Harper the letter, who planned to give it to Sexton and Sexton's mother in preparation for them testifying before the grand jury. (*Id.* at 109-10). Radcliffe confirmed with Harper that Harper gave them the letter and that based on how the meeting between Sexton, her mother, and Harper went, Radcliffe told Seth that the kidnapping charge should be "over right there." (*Id.* at 117). On January 25, 2016, the evening before Sexton was scheduled to testify before the grand jury, Radcliffe texted Harper asking if Sexton was "ready for tomorrow." (*Id.* at 124). Harper responded that he talked to her throughout the day, going over the letter, and Sexton was "100 percent ready." (*Id.*).

### B.    *Motion for a New Trial*

After the jury returned its verdict convicting Radcliffe of federal witness tampering, Radcliffe moved the Court for a new trial. He argued, *inter alia*, that newly discovered evidence revealed that Harper, his alleged co-conspirator and the key witness against him, had given false testimony at trial. (ECF No. 228). Radcliffe claimed that Harper's sister, Kimberly Morgan ("Morgan"), stated that Harper told her that he intended to lie at trial. (*Id.* at 2). The Court permitted Radcliffe to review Harper's recorded jail telephone calls, but Radcliffe stated that after reviewing hundreds of hours

of calls, the "exculpatory calls were not found." (*Id.*). Radcliffe indicated that the conversation in which Harper told his sister that he intended to lie might have occurred during jail visits. Thus, the Court held a hearing on May 3, 2017 to take witness testimony. (*Id.*).

At this hearing, Radcliffe's wife, Angela Radcliffe, testified that Morgan called her during the trial and told her that Harper said in a telephone conversation that he could not tell the truth, or he would lose his plea deal. (*Id.* at 3). However, Morgan disputed that she made that statement. Rather, Morgan testified that she told Angela Radcliffe during a break in trial that she was hurt that Harper admitted to lying to her about his prior crimes and that she was surprised how aggressive he was being in his testimony. (*Id.* at 2). She stated to Angela Radcliffe that Harper told her that he did not want to testify but was forced to do so by the United States under the terms of his plea agreement. (*Id.*). Nonetheless, Morgan unequivocally stated that Harper told her that he would tell the truth. Morgan was adamant that she never told anyone that Harper admitted to lying during trial. (*Id.*). Morgan's husband provided similar testimony during the hearing. (*Id.* at 2-3).

The Court ultimately found that Radcliffe was not entitled to a new trial, noting that Angela Radcliffe's recollection of Morgan's statement to her would be inadmissible hearsay and not likely to produce an acquittal. (*Id.* at 4). Furthermore, the Court noted that the Morgans denied ever making a statement that Harper intended to offer untruthful testimony, or admitted to doing so, and there was no evidence produced to indicate that Harper had ever made such statements to anyone. (*Id.*). Finally, the Court discussed that Harper was cross-examined at trial and admitted to past fraudulent conduct and to his hope of receiving a sentence reduction for substantial assistance in

exchange for his testimony against Radcliffe. (*Id.* at 5). Nevertheless, as the Court stated, the jury apparently found Harper's testimony, in combination with the other evidence, to be credible. (*Id.*). The Court stated that there was no new admissible evidence that was likely to alter the jury's verdict. (*Id.*).

### C.    *Direct Appeal*

Radcliffe filed a direct appeal in the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"). However, while his appeal was pending, Radcliffe filed the instant motion under § 2255 on September 24, 2017. (ECF No. 256). His direct appeal was voluntarily dismissed by order entered on October 13, 2017. (ECF No. 260).

### D.    *§ 2255 Motion*

Radcliffe asserts that he is being held in custody in violation of the Constitution, laws, or treaties of the United States because (1) prosecutorial misconduct denied him the right to due process and a fair trial and (2) ineffective assistance of his criminal defense counsel denied him the right to counsel guaranteed by the Sixth Amendment. (ECF Nos. 256, 263).[2] In his first ground for relief, Radcliffe alleges that the United States withheld material exculpatory and/or impeachment evidence in his criminal case, including a transcript of text messages from Seth's cell phone, recorded communications between Harper and Morgan, and a list of accusations written by Harper. Radcliffe further asserts that the United States failed to correct Harper's perjured testimony at trial. In his second

---

[2] Some of Radcliffe's specific claims of prosecutorial misconduct are not clearly defined in his motion, but are discussed in more detail in his reply. Radcliffe has not moved to amend his motion. However, his reply was filed within one year of his conviction becoming final given the fact that his direct appeal was dismissed on October 13, 2017 and his reply was filed on January 7, 2018. (ECF Nos. 260, 263). Moreover, where, as is the case here, the prisoner is proceeding *pro se*, his pleadings are construed liberally and held to less stringent standards than an attorney drafting a complaint. *Id.* (citing *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), *cert. denied*, 439 U.S. 970 (1978)). Therefore, the undersigned considered all of the claims raised by Radcliffe in his motion and in his reply.

ground for relief, Harper asserts that his counsel's performance was constitutionally ineffective for numerous reasons, including that his attorney allegedly told him that the text messages on Seth's phone were not important to his case, did not call Radcliffe's family members to testify at trial, did not effectively cross-examine Harper, did not object to irrelevant prejudicial evidence, and did not notify the Court of information bearing on Harper's alleged false testimony.

In response to Radcliffe's § 2255 motion, the United States argues that Radcliffe's prosecutorial misconduct claims are procedurally barred because Radcliffe does not show cause and prejudice for not raising such claims in a direct appeal. (ECF No. 262 at 12-15). Also, the United States denies that it withheld exculpatory evidence and contends that Radcliffe does not make any showing that Harper perjured himself or that the United States was aware of any perjury. (*Id.* at 15-19). Regarding Radcliffe's allegations of ineffective assistance of counsel, the United States asserts that Radcliffe's defense attorney thoroughly cross-examined Harper and that Radcliffe does not show that calling his family members to testify or introducing additional text messages would have reasonably affected the verdict. (*Id.* at 21).

## II.    **Standard of Review**

Under 28 U.S.C. § 2255, a federal prisoner may move the court which imposed his sentence to vacate, set aside, or correct his sentence on the basis that (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "that the court was without jurisdiction to impose such sentence," (3) "that the sentence was in excess of the maximum authorized by law," or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255. Due to the fact that a § 2255 proceeding is a civil collateral attack upon the federal prisoner's judgment of conviction, the prisoner must

14

prove his or her claims by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). "When deciding a § 2255 motion, a court must promptly grant a hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

## III.    Discussion

In his § 2255 motion and reply, Radcliffe alleges that his sentence must be vacated due to ten instances of prosecutorial misconduct occurring before and during his trial and numerous incidents of ineffective assistance of trial counsel. (ECF Nos. 256, 263). Radcliffe's prosecutorial misconduct claims can be separated into two general categories. First, Radcliffe alleges that the United States failed to disclose various pieces of materially favorable exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and material impeachment evidence under *Giglio v. United States*, 405 U.S. 150 (1972). Second, Radcliffe claims that the United States presented and/or failed to correct false testimony at trial, which invokes the Supreme Court of the United States' ("Supreme Court") ruling in *Napue v. People of State of Ill.*, 360 U.S. 264 (1959).

Before addressing the specifics of Radcliffe's prosecutorial misconduct claims, the undersigned notes that the United States argues that these claims are procedurally barred because they were not raised in a direct appeal. As stated, Radcliffe voluntarily withdrew his direct appeal and instead filed the instant motion for post-conviction relief. Thus, there was no direct appeal in his case.

"Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *Fuller v. United States*, No. 4:13-CR-00072, 2018 WL 3398129, at *2 (E.D. Va. July 11, 2018) (quoting

15

*United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992)). For that reason, "[m]otions under § 2255 'will not be allowed to do service for an appeal.'" *Fuller*, 2018 WL 3398129, at *2 (quoting *Sunal v. Large*, 332 U.S. 174, 178 (1947)). Any issues which the prisoner "already fully litigated on direct appeal may not be raised again 'under the guise of a collateral attack' unless there has been a 'material change' in the law 'between the direct appeal and the § 2255 motion.'" *Id.* (quoting *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976) and *United States v. Masters*, No. 91-6100, 1992 WL 232466, at *2 (4th Cir. 1992)); *see also United States v. Roane*, 378 F.3d 382, 396 n.7 (4th Cir. 2004).

Further, as relevant to this case, "issues that might have been, but were not, raised on direct appeal may not be raised subsequently in a § 2255 motion." *Id.* (citing *Sanders v. United States*, 230 F.2d 127 (4th Cir. 1956), *cert. denied*, 351 U.S. 955 (1956)). "[W]aived claims are procedurally defaulted absent a showing of cause and actual prejudice." *Hernandez Portillo v. United States*, No. 1:07-CR-00081-GBL, 2014 WL 3615815, at *7 (E.D. Va. July 17, 2014) (citing *United States v. Frady,* 456 U.S. 152, 167 (1982)). "To obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted Petitioner must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains.'" *Id.* A § 2255 movant "can only overcome this procedural bar if he can show a fundamental miscarriage of justice "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent ... even in the absence of a showing of cause for the procedural default.'" *Id.* (quoting *Murray v. Carrier,* 477 U.S. 478, 496 (1986)).

Nonetheless, certain types of claims, such as *Brady* claims and ineffective

assistance of counsel claims, are often raised for the first time in a § 2255 proceeding. Here, the United States raises no argument that Radcliffe's ineffective assistance of counsel claims are barred in this action. *See Massaro v. United States*, 538 U.S. 500, 509 (2003) ("We do hold that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255."). However, the United States contends that Radcliffe's prosecutorial misconduct claims, including his *Brady* claims, are barred because he did not raise them on direct appeal.

The "Fourth Circuit has never held that a *Brady* claim raised for the first time in a collateral challenge under § 2255 is procedurally defaulted." *United States v. Caro*, 733 F. App'x 651, 674 (4th Cir. 2018). A *Brady* claim, by definition, asserts that the government suppressed materially favorable evidence at trial. Consequently, the evidence at issue is often "not part of the trial record—and thus not part of the record to which a court of appeals is limited on appeal." *Id.* at 673-74 (citing *United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011) ("*Brady* cases ... typically involve a defendant's post-trial discovery of evidence that the Government has assertedly suppressed."); *United States v. Dodson*, 291 F.3d 268, 275 (4th Cir. 2002) (stating that *Brady* claims "often arise for the first time in collateral proceedings")).

Here, the alleged *Brady* evidence was not part of the trial record to which the Fourth Circuit was limited on direct review. While Radcliffe ostensibly could have raised at least some of the *Brady* claims in his motion for a new trial and then included it in a direct appeal, Radcliffe faults his attorney for the fact that none of the *Brady* evidence was used at his trial. His *Brady* claims are inextricably intertwined with his ineffective assistance of counsel claims in such a manner that the undersigned has necessarily

17

considered the merits of his prosecutorial misconduct claims with his ineffective assistance of counsel claims. For the reasons discussed below, the record before the Court conclusively demonstrate that Radcliffe's claims based on alleged *Brady* and *Giglio* materials lack merit.

### A.    *Brady Claims*

The Supreme Court established in *Brady* that "prosecutors have an affirmative duty to disclose evidence that is both favorable to the defendant and 'material either to guilt or punishment.'" *Fuller*, 2018 WL 3398129, at *3 (quoting *Brady*, 373 U.S. at 87). The Supreme Court explained that suppression of "such evidence is a violation of the defendant's Fifth Amendment right to Due Process." *Id.* Evidence is considered "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" and a "reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Material evidence that falls under *Brady* includes both exculpatory evidence and impeachment evidence, which is often called '*Giglio* material.'" *Id.* (citing *Bagley*, 473 U.S. at 676). The prosecution is obligated to disclose *Brady* and *Giglio* material regardless of whether the defense requests it. *Id.* There are three necessary elements to prove a *Brady* violation. The defendant must "show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, 'prejudice must have ensued'; and (3) that the prosecution had materials and failed to disclose them." *Id.* at *4 (quoting *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010)). A *Brady* violation does not occur, however, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable

18

defendant would have looked." *Id.* (citing *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)).

### (1)    Text messages from Seth Radcliffe's cell phone

For his first *Brady* claim, Radcliffe asserts that the United States withheld a transcript of text messages from Seth's cell phone that documented a conversation between Sexton, who was using Seth's phone, and Harper, which occurred immediately after the alleged kidnapping; the texts were allegedly exchanged from 9:21 p.m. on December 23, 2015 to 12:30 a.m. on December 24, 2015. (ECF Nos. 256 at 5-6, 263 at 5). Radcliffe claims that this evidence is exculpatory because it shows that Harper began tampering with Sexton hours before Harper spoke with Radcliffe and the two men allegedly entered into a conspiracy to influence Sexton's testimony. (ECF No. 256 at 6). Radcliffe also contends that the text messages could have been used to impeach Harper about what he discussed with Sexton during their 9:44 a.m. phone call on December 24, 2015. (*Id.*).

The United States responds that Radcliffe's claim is baseless, because the United States provided Radcliffe with all downloads from Harper's phone that were in its possession, as well as the billing records for Harper's phone covering December 23 through 24, 2015, which the United States argues "detailed incoming calls and text messages to [Harper's] number." (ECF No. 262 at 15-16). Radcliffe asserts, in reply, that the United States misses his point regarding the text messages. He states that the text messages at issue were not provided to him in the discovery from Harper's cell phone because Harper "lost" the cell phone that he used to send the texts, and the discovery materials provided to Radcliffe concerned Harper's *subsequent* cell phone. (ECF No. 263 at 5). According to Radcliffe, the report from Seth's cell phone contained the evidence of

the text messages between Sexton and Harper immediately after the alleged kidnapping, and the United States failed to provide Seth's cell phone report. (*Id.*).

To begin, neither Radcliffe, nor the United States, supplemented the record with a transcript of the alleged text messages between Harper and Sexton. However, the information that Radcliffe asserts was in the text messages was provided to the grand jury and at trial. Radcliffe claims that the text messages were exculpatory because they would show that Harper immediately began corrupting Sexton's testimony on December 23, 2015. Yet, according to Radcliffe, Harper admitted to the grand jury that he texted with Sexton, who was using Seth's cell phone, immediately after Seth was arrested and Sexton was sitting in a police car waiting to be picked up. (ECF No. 256 at 6). Sexton testified at trial that it was Harper who "immediately," on the same night as the kidnapping, started telling her how much it would hurt Seth if she told the truth about what happened. (ECF No. 250 at 4). She stated that Harper talked to her about changing her story and that Radcliffe was not mentioned. (*Id.*). Harper likewise admitted that he did not speak to Radcliffe until 11:49 p.m. on the night of the kidnapping after he had already been communicating with Sexton. (ECF No. 248 at 61). Therefore, even if Radcliffe is able to show that the United States withheld text messages that were in its possession, Radcliffe fails to show that any prejudice ensued from the failure to disclose the text messages to him.

Furthermore, the text messages that Radcliffe alleges that the United States withheld from him are not exculpatory, as he suggests. Radcliffe argues that if Harper began corrupting Sexton's testimony before Harper spoke to Radcliffe on the evening of the kidnapping, there could not have been any conspiracy between Radcliffe and Harper to corrupt Sexton's testimony. This contention is simply incorrect. Radcliffe was

convicted of violating 18 U.S.C. § 1512(b)(1), which provides a penalty to anyone who "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding," and 18 U.S.C. § 1512(k), which states that a person who conspires to commit such offense, or any other offense stated in 18 U.S.C. § 1512, is subject to the same penalties. There is no requirement that the perpetrator of the criminal conduct described in § 1512(b)(1) act first, or act alone, nor is there a requirement in § 1512 that the perpetrators act simultaneously. To the contrary, an individual may be convicted of conspiracy if he willfully participates in an unlawful scheme on even one occasion, regardless of whether the scheme predated his involvement. *See United States v. Burgos,* 94 F.3d 849, 858 (4th Cir. 1996) (holding that "a defendant properly may be convicted of conspiracy without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part.") (quoting *United States v. Roberts,* 881 F.2d 95, 101 (4th Cir. 1989)). Radcliffe makes no showing that Harper's alleged prior witness tampering of Sexton was relevant to the charges against him or would have had any conceivable effect on the outcome of the proceeding. Therefore, the undersigned **FINDS** that Radcliffe's claim that the United States violated *Brady* by not providing him a transcript of text messages from Seth's phone is conclusively without merit.

### (2)    Harper's phone calls with Morgan

Radcliffe's next *Brady* claim relates to three recorded phone calls between Harper, who was incarcerated, and his sister, Morgan, beginning approximately four months

before Radcliffe's trial. In the first call, on June 8, 2016, Harper reportedly told Morgan that Sexton was "lucky to be alive," that the Radcliffes did not know the truth about what Seth did, but that Harper knew the truth and what Seth planned to do. (ECF Nos. 256 at 13, 263 at 2). Harper also purportedly indicated in that call that Seth hit Sexton during the kidnapping. (*Id.*). Radcliffe argues that this recording shows that Harper withheld kidnapping details from him, which Radcliffe contends is evidence refuting the existence of a conspiracy between them.

In the next call, on June 12, 2016, Harper supposedly told his sister not to tell anyone, but that some recordings were not provided to Radcliffe in discovery. (ECF Nos. 256 at 33, 263 at 2). Radcliffe argues that this recorded call between Harper and Morgan proves that the United States was withholding evidence supplied by its confidential informant, Matheny. In Radcliffe's view, the Government wanted to hide the fact that Harper had his own motivations to tamper with Sexton's testimony. Specifically, Harper wanted to keep Seth from being indicted, because Harper was afraid Seth might "snitch" on him for committing arson and insurance fraud. (ECF Nos. 256 at 33, 263 at 1-2).

Finally, on July 7, 2016, Harper allegedly told his sister in a recorded jail call that he "didn't know" that Seth hit Sexton during the kidnapping, but he found out and it did not surprise him. (ECF Nos. 256 at 9, 263 at 2). Radcliffe asserts that this call was material because it was inconsistent with Harper's other statements about whether Seth harmed Sexton during the kidnapping and that Sexton was afraid that Seth would harm her if he was released from jail.

Regarding the recorded jail phone calls between Harper and his sister, *Brady* only applies to materially favorable evidence that the government possessed before trial. *Watkins v. Rubenstein*, 802 F.3d 637, 642 (4th Cir. 2015) (stating that the evidence must

have been in the prosecution's possession before trial). The United States maintains that it did not possess Harper's recorded jail calls until December 12, 2016—a date well after Radcliffe's trial, which concluded in October 2016. (ECF Nos. 186 at 2, 262 at 19). In fact, according to the United States, the recorded calls were not subpoenaed from the Jail Authority until the United States was ordered to produce the calls in response to Radcliffe's motion for a new trial. (*Id.*).

Moreover, Radcliffe fails to satisfy another essential element of *Brady* in that he cannot show by a preponderance of the evidence that any of these recorded telephone calls had material exculpatory or impeachment value. Other than to parse the word choices made by Harper at trial, Radcliffe provides no explanation, let alone evidence, as to how the information revealed in the telephone calls bears on his involvement in the crimes of conviction. Radcliffe was accused of witness tampering and conspiracy to witness tamper. Whether or not Harper shared with Radcliffe all of the details of the kidnapping is not particularly material to whether they conspired to alter Sexton's testimony. Radcliffe asserts that certain evidence was important to show that Harper was "highly motivated" to corrupt Sexton's testimony. However, Harper's motivation was never in question. Harper entered into a plea agreement conceding his guilt to the witness tampering charge and readily admitted his incentive to corrupt Sexton's testimony during Radcliffe's trial. That admission does not eliminate the possibility of Radcliffe's participation. Conspiracies often unite individuals who have disparate motives for engaging in the same criminal enterprise. Reasonable jurors certainly could conclude that Radcliffe had an separate, if not more compelling, motivation to tamper with Sexton's testimony. Thus, Radcliffe fails to show how hiding evidence of Harper's motivation to tamper would constitute exculpatory evidence for Radcliffe.

Furthermore, Radcliffe fails to establish how the recorded phone calls were materially relevant to impeach Harper's testimony. Radcliffe argues that Harper provided inconsistent accounts by (1) stating to the grand jury in April 2016 that nothing happened to Sexton during the kidnapping other than it being a terrorizing event, (2) stating to his sister in June 2016 that he knew the truth about what happened during the kidnapping, including Seth hitting Sexton; (3) stating to his sister in July 2016 that he "didn't know he hit [Sexton] during the crime," but he found out and it didn't surprise him; and, finally, (4) stating during the trial that Sexton was afraid that Seth would harm her if released and that he told Radcliffe on or before January 2016 that Seth had harmed Sexton. (ECF No. 263 at 1). However, Radcliffe does not indicate that the recorded phone calls between Harper and his sister state when Harper discovered that Seth harmed Sexton during the kidnapping. According to Radcliffe's recitation of the recorded phone calls, Harper only made clear that he had learned of such fact by the time of the phone calls in June and July 2016, which is consistent with him not knowing of that fact during his grand jury testimony months earlier in April 2016. Also, Radcliffe misstates Harper's testimony regarding what he told Radcliffe by January 2016. Harper testified that he told Radcliffe that Sexton was afraid of Seth. (ECF No. 248 at 140-41). The fact that Harper might not yet have known by January 2016 that Seth harmed Sexton during the kidnapping is not inconsistent with him knowing at that time that Sexton was afraid of Seth. Radcliffe fails to show that Harper perjured himself on these topics.

More importantly, the alleged testimony regarding whether or not Seth harmed Sexton during the kidnapping had no bearing on Radcliffe's guilt or punishment relating to the witness tampering charge. While that testimony was relevant to telling the story of the kidnapping and of Harper's conversations with Sexton, it was not probative of any

material facts or elements in establishing the criminal charges against Radcliffe. Furthermore, to the extent that Radcliffe argues that the recordings could have called into question Harper's veracity and credibility as a witness, Harper was thoroughly cross-examined and admitted to acts of dishonesty and criminal activity. He also explained that he hoped to receive a sentence reduction in exchange for his testimony against Radcliffe. The recorded phone calls were simply not material impeachment evidence against Harper. Accordingly, the undersigned **FINDS** that Radcliffe fails to assert a viable *Brady* claim relating to the alleged recorded telephone calls between Harper and his sister, Morgan.

### (3)    Harper's written accusations

Radcliffe attached to his § 2255 motion a list of what he states are accusations against Seth and Radcliffe that Harper hand wrote and gave to his attorney shortly after his incarceration on February 23, 2016 in connection with a proposed plea deal. (ECF No. 256 at 12, 28). Radcliffe asserts that Harper's attorney gave the list to the United States, which provided it to Radcliffe's counsel only days before Radcliffe's trial. (*Id.* at 12). Radcliffe argues that the list shows that Harper was not alleging that he conspired with Radcliffe to tamper with Sexton and is also critical because it shows that Harper did not mention anything about Seth hitting, harming, or hurting Sexton. (*Id.*).

Radcliffe refers to the list as *Brady/Giglio* material. (ECF No. 263 at 1). However, he fails to adduce any reason that this list was exculpatory or material to impeach Harper's testimony. The list does not make any statements denying the conspiracy and the fact that Harper did not include in the list anything about Seth harming Sexton was not material to Radcliffe's case. Therefore, the undersigned **FINDS** that Radcliffe fails to assert a potential *Brady* violation regarding Harper's handwritten list.

### B.    Napue Claims

Moving on to Radcliffe's next prosecutorial misconduct claim, Radcliffe asserts that the prosecution failed to correct Harper's "perjured testimony" and actually "helped lead Harper away from the truth" during trial. (ECF No. 256 at 8). Radcliffe goes so far as to accuse the United States of conspiring with Harper, "a serial criminal," to present false testimony at trial. (ECF No. 263 at 1). Radcliffe again points to Harper's alleged grand jury testimony on April 19, 2016 that "nothing actually happened" to Sexton during the kidnapping other than "it being a terrorizing event." (ECF No. 256 at 9). Radcliffe states that Harper then told his sister in a recorded jail telephone call on June 8, 2016 that Radcliffe and his family did not "know the truth" and that Seth hit Sexton and did a "lot of stuff" of which Radcliffe and his family were unaware. (ECF No. 263 at 1). Harper next allegedly stated to his sister in a recorded jail call on July 7, 2016, a few months before Radcliffe's trial, that he "didn't know that [Seth] hit Sexton" during the kidnapping, but he found out and it did not surprise him. (ECF Nos. 256 at 8, 263 at 1).

Radcliffe argues that the prosecution, knowing about Harper's grand jury testimony and recorded conversations with his sister, failed to correct Harper's "perjured testimony" that Sexton was afraid that Seth would hurt her when he was released, as well as Harper's testimony that he told Radcliffe that on or before January 24, 2016 that Seth had hit/hurt Sexton during the kidnapping. (ECF Nos. 248 at 140, 249 at 74, 263 at 1, 2).

Under Napue, the prosecution "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" or "allow[ ] it to go uncorrected when it appears." Chavez, 894 F.3d at 599 (quoting Napue, 360 U.S. at 269). A "conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected

the judgment of the jury.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Radcliffe failed to raise this claim in a direct appeal. *Fuller*, 2018 WL 3398129, at *3-4 ("Claims of prosecutorial misconduct should generally be raised on direct appeal."). *Reese v. United States*, No. 1:15CR32, 2017 WL 2623770, at *4 (E.D. Va. June 16, 2017). However, even if the claim were not procedurally barred, it would be dismissed as wholly without merit. Radcliffe asserts that the United States should have corrected Harper's testimony that Sexton was afraid of Seth given Harper's previous statements to the grand jury and in a recorded call to his sister indicating that he was initially unaware that Seth hit Sexton during the kidnapping. As previously discussed, Radcliffe does not verify any material conflict between Harper's statements and his testimony at trial. Thus, not only does Radcliffe fail to establish that Harper perjured himself, but Radcliffe also fails to demonstrate that Harper's testimony on the subject of Sexton's fear of Seth or the physical abuse of Sexton were in any manner used to secure the conviction against Radcliffe for witness tampering. Therefore, the undersigned **FINDS** that Radcliffe's claim that the prosecution obtained a tainted conviction by presenting or failing to correct false testimony by Harper is without merit.

### C.    *Ineffective Assistance of Counsel Claims*

Radcliffe next alleges that his criminal defense lawyer was constitutionally deficient for numerous reasons. The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a

claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

### (1)    Seth's cell phone records

Radcliffe's first claim of ineffective assistance of counsel corresponds to his first *Brady* claim concerning supposed text messages from Harper to Sexton directly after the alleged kidnapping. Radcliffe asserts that the texts showed that Harper began tampering with Sexton as a witness before Harper spoke to Radcliffe that evening. Radcliffe argues that his counsel advised him that the text messages were not relevant to his witness tampering case and thus "enabled the United States to withhold the exculpatory transcript evidence that was vitally important" to Radcliffe's defense. (ECF No. 256 at 12). As discussed, not only was it adduced at trial that Harper immediately began corrupting Sexton's testimony before speaking to Radcliffe, but Radcliffe fails to show how Harper's prior actions had any bearing on the case against him.

### (2)    Testimony of Radcliffe's family members

Radcliffe next claims that his counsel's representation was deficient because his attorney refused to allow Radcliffe's wife and daughter to testify that they listened on speakerphone to the 11:49 p.m. phone call on December 23, 2015 between Radcliffe and Harper and that there was no discussion about trying to influence Sexton's testimony or "story." (ECF No. 256 at 12).[3] Even if Radcliffe's family members could have testified to dispute Harper's testimony that Radcliffe and Harper discussed during that call that they "needed to get to [Sexton] before anyone else [did], (ECF No. 248 at 62), the fact remains that the evidence concerning that single phone call was not the only evidence offered against Radcliffe. As noted, the United States offered evidence showing a pattern of communications between Radcliffe, Harper, and Sexton that began directly after the kidnapping; recorded phone calls between Radcliffe and Seth; and a letter, which Radcliffe admitted that he received from Seth and gave to Harper to pass to Sexton in preparation for her grand jury testimony. Radcliffe does not assert that his wife and daughter could have testified to rebut any of the foregoing evidence, but rather, just that they could have countered one piece of evidence used against Radcliffe. Furthermore, as discussed, Harper's credibility was thoroughly questioned at trial. He admitted to acts of dishonesty and his self-interest in testifying against Radcliffe. Radcliffe fails to assert a viable claim that his counsel's actions were objectively unreasonable or any reasonable probability that the outcome of the proceeding would have been different if his wife and daughter testified on his behalf regarding the December 23, 2015 phone call.

---

[3] Radcliffe alleges that his daughter heard the entire 40-minute phone call and that his wife heard the last 10 to 15 minutes. (ECF No. 256 at 12).

### (3)     Harper's list of accusations

In his next claim of ineffective assistance of counsel, Radcliffe argues that his counsel "refused to admit exculpatory evidence that was handwritten by Harper." (ECF No. 256 at 12). Radcliffe again refers to the list attached to his § 2255 motion, which he states that Harper wrote concerning his "accusations" against Seth and Radcliffe as he negotiated a plea deal for himself. (ECF No. 256 at 12, 28). As previously discussed, Radcliffe fails to adduce any reason that this list was exculpatory or material for impeachment purposes. Therefore, he cannot show that his attorney was deficient under *Strickland* in failing to use it at trial.

### (4)     Harper's testimony about texting with Sexton

Radcliffe asserts that his counsel was ineffective because he "failed to impeach Harper for testifying that [Sexton] did not text [him] the evening of December 23, 2015," although Harper previously told the grand jury that Sexton texted him "a lot of stuff" that night. (ECF No. 256 at 12). However, in the testimony that Radcliffe cites, Harper merely stated that his first communication with Sexton during the kidnapping was a phone call. (ECF No. 248 at 61). Harper did not allege that Sexton never texted him on December 23, 2015. Rather, Radcliffe's attorney cross-examined Harper regarding his communications with Sexton and Harper responded that Sexton called him during the kidnapping on December 23, 2015 and also texted him "that day." (ECF No. 249 at 37-38). To the extent that Radcliffe argues that his counsel did not "effectively confront" Harper regarding the issue, there is no evidence that his counsel's actions were objectively unreasonable or prejudiced Radcliffe. His attorney questioned Harper about his communications with Sexton and Harper admitted to talking to her over the phone and communicating with her through text messages. There was no lie for Radcliffe's attorney to expose, as Harper

admitted to the text messages. Moreover, as previously discussed, Radcliffe's attorney cross-examined Harper at length to emphasize Harper's acts of dishonesty and self-interest in testifying against Radcliffe.

### (5)    Text messages between Harper and Radcliffe

Radcliffe next claims that his counsel should have used text messages that he and Harper exchanged the morning after the kidnapping to impeach Harper's testimony. First, Radcliffe points to text messages, which he contends were sent right before Harper spoke to Sexton at 9:44 a.m. on December 24, 2015 and in which Radcliffe expressed that he heard that Seth and Sexton's relationship appeared normal the night of the alleged kidnapping and to which Harper replied "wow." (ECF No. 256 at 12). Radcliffe asserts that his attorney could have used the text messages to contradict Harper's testimony that he and Radcliffe were conspiring to corrupt Sexton's testimony that morning. (*Id.*). However, the text messages identified by Radcliffe do not contradict Harper's testimony regarding the conspiracy. Harper stated that he and Radcliffe discussed during phone calls on December 23, 2015 at 11:40 p.m. and on December 24, 2015 at 12:16 a.m. that they needed to "get to [Sexton] before anyone else [did]." (ECF No. 248 at 62). His testimony did not relate to or contradict the cited text messages from that morning.

Radcliffe further asserts that his counsel should have used text messages which were also sent shortly before 9:44 a.m. on December 24, 2015 in which Harper allegedly told Radcliffe that Sexton did not confirm that Seth pointed a gun at her, but that she did state that Seth pointed a gun at Sexton's neighbor. (ECF No. 256 at 12). Radcliffe argues that the text messages could have been used to show that (1) Harper lied when he stated that Sexton told him about Seth pointing a gun at her neighbor during their 9:44 a.m. phone call because he already knew that information before the phone call with Sexton,

31

(2) Harper withheld kidnapping details from Radcliffe; and (3) Harper lied when he testified twice that Seth pointed a gun at Sexton. (*Id.*). Radcliffe fails to show how the text messages were important to his case. Harper testified that he and Sexton discussed during a phone call on December 24, 2015 that Seth pointed a gun at Sexton's neighbor, stated "die, bitch," and pulled the trigger, but the gun misfired. (ECF No. 248 at 63-64). The cited text messages do not contradict such testimony. Harper had many communications with Sexton beginning during the kidnapping. He could have learned the information about the neighbor earlier or discussed it with Sexton multiple times. He also could have subsequently learned that Seth pointed a gun at Sexton. Radcliffe makes no showing that the fact that his attorney did not question Harper about the text messages was so objectively unreasonable that his attorney failed to function as counsel guaranteed by the Sixth Amendment. Radcliffe also does not show any reasonable probability that the fact that his counsel did not ask Harper about the text messages affected the outcome of his trial, particularly given that Radcliffe's attorney thoroughly cross-examined Harper and cast doubt on his credibility.

### (6)    Prejudicial evidence

Radcliffe argues that his counsel failed to object to evidence concerning the kidnapping, which he contends was irrelevant to the witness tampering charge against him and was prejudicial. (ECF No. 256 at 12-13). Specifically, Radcliffe argues that his counsel did not object to the jury being shown "pictures of bullet holes, shell casings, and guns used to shoot holes in doors;" the neighbor's testimony about Seth pointing a gun at her; and Sexton's testimony about the kidnapping. (*Id.*). Radcliffe fails to show that his counsel was ineffective in failing to object to this evidence, or that it prejudiced the outcome of his case. None of the evidence concerning bullet holes, guns, or the kidnapping

was, in any way, attributed to Radcliffe. Rather, it was used to illustrate Radcliffe's motive in trying to cover up serious criminal charges lodged against his son. The United States argued that Radcliffe tried to influence Sexton to omit these unfavorable details of the kidnapping from her grand jury testimony.

Furthermore, even if Radcliffe's counsel was constitutionally deficient in not objecting to the admission of such evidence at trial, none of the alleged evidence was used to secure the conviction against Radcliffe and there is no reasonable probability that, if the evidence were not used at trial, that Radcliffe would have been acquitted. The evidence that was used to convict Radcliffe focused on his communications with Harper and Harper's communications with Sexton. Evidence was offered in the form of cell phone records, recorded jail calls, a letter written by Seth, and co-conspirator testimony. There is no reasonable possibility, much less probability, that the outcome of Radcliffe's trial would have been different if the jury never saw and heard the salacious details of the kidnapping.

### (7)    Harper's communications with his sister

Finally, Radcliffe argues that his counsel was ineffective because he did not utilize at trial three communications between Harper and his sister, which Radcliffe argues were relevant to show that Harper lied in his trial testimony. First, Radcliffe alleges that in a recorded jail call, on October 17, 2016, after the first day of trial, Harper's sister questioned Harper about whether his testimony was coerced because she recalled that Harper denied his guilt in the beginning and told her that he did not believe that he had tampered with Sexton as a witness, yet admitted his guilt at trial. (ECF No. 256 at 13). Radcliffe argues that this jail call was relevant to show that Harper's sister felt that Harper perjured himself during trial. (*Id.*).  Second, Radcliffe states that his attorney "refused to

notify the Court" that Radcliffe's wife overheard Harper "influencing his sister to change her story" before the hearing on Radcliffe's motion for a new trial. (*Id.*). Finally, Radcliffe argues that his counsel should have presented during his hearing on his motion for a new trial a recorded phone call in which Harper allegedly stated to his sister on June 8, 2016, over four months before trial, that Radcliffe and his family did not know all of the details about the alleged kidnapping. (*Id.*). Harper supposedly stated that Sexton was "lucky to be alive," that Harper knew the truth regarding what Seth planned to do, and that Seth hit Sexton during the kidnapping. (*Id.*). As previously noted, Radcliffe claims that the recording shows that there could not have a been a conspiracy because Harper was withholding details regarding the kidnapping from Radcliffe. (*Id.*).

Radcliffe is attempting to re-litigate the issues considered in his motion for a new trial. He fails to show that his counsel acted objectively unreasonably by failing to offer inadmissible hearsay evidence and does not offer any evidence, which, if it had been submitted by his counsel, which would have resulted in an acquittal or new trial. Radcliffe was given the opportunity to listen to Harper's recorded jail calls and no "smoking gun" was discovered indicating that Harper intended to give false testimony or admitted to giving false testimony. The relevant witness also testified at the Court's May 3, 2017 hearing. While Radcliffe may be hesitant to accept the Court's ruling on these issues, nothing that Radcliffe offers now demonstrates that his counsel's performance was deficient in arguing that Harper lied at trial. Furthermore, as previously discussed, there is no merit to Radcliffe's claim that Harper did not tell him all details of the alleged kidnapping and, thus, there could not have been any conspiracy between Radcliffe and Harper to corrupt Sexton's testimony regarding the kidnapping. Radcliffe does not offer any legal authority, nor is there any legal authority, which supports such a claim.

For all of the above reasons, the undersigned **FINDS** that Radcliffe fails to assert any cognizable claims that his counsel's performance was constitutionally deficient under the S*trickland* standard.

## IV.    <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the presiding district judge confirm and accept the foregoing findings and **RECOMMENDS** that the Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255, (ECF No. 256), be **DENIED,** and that this action be **DISMISSED,** with prejudice, and removed from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Movant and counsel of record.

**FILED:** March 25, 2019

Cheryl A. Eifert
United States Magistrate Judge